United States District Court
Southern District of Texas
ENTERED

FEB 1 3 2014

David J. Bradley, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. B-12-374-1 |
| | § | |
| ARMANDO VILLALOBOS | § | |
| | § | |
| _____ | § | |

# ORDER

This Court announced its rulings in open court with respect to certain post-trial motions and objections to the Presentence Investigation Report ("PSI") filed by Armando Villalobos (hereinafter "Villalobos" or "Defendant") as part of the sentencing hearing. The Court finds it appropriate to memorialize some of those rulings in this Order.

First, the Court overruled the objections and/or motions to set aside Counts 1, 2, 4, 6, and 9. (The jury found the Defendant not guilty of the charges made in Counts 7 and 8.) The Court found the objections to be without merit and that the evidence supported the conclusions reached by the jury. Counts 3 and 5 will be discussed below.

## I. Objections to the PSI

The Court also sustained certain objections to the PSI upon which it feels the need to expound. The two objections it sustained were those addressed to the role adjustment applied to Villalobos in the PSI and to the assessed enhancement for obstruction of justice. With respect to the four-point enhancement for role, the PSI found that the criminal conspiracy involved five or more participants and that Villalobos was the leader/organizer of the criminal activity. *See U.S.*

Sentencing Guidelines Manual § 3B1.1 (2013) (hereinafter "USSG"). There can be no question that Villalobos was the leader of the criminal enterprise involved in this case.[1] The Court partially granted the Defendant's objection to the four-point assessment because this enterprise, while criminal and involving numerous individuals, may not have truly involved five (5) "participants" as that term is defined in the Commentary to § 3B1.1. To reach that number, the Court might have had to count an individual who had himself been acquitted of similar charges. This Court recognizes that it could have relied upon the "otherwise extensive" prong to apply this enhancement; however, the Court did not feel this prong of § 3B1.1(a) was justified on the basis of the evidence presented at trial. While the evidence certainly supports the conclusion that the schemes implemented by the Defendant were at times clever and ingenious, the Court is not willing to extrapolate these qualities to be the equivalent of "extensive." Therefore, the Court reduced the role adjustment to two points, pursuant to § 3B1.1(c). The overwhelming evidence that the Defendant was an organizer, leader, and manager justifies this enhancement.

The Court also sustained the objection to the PSI's two-point enhancement for obstruction of justice. Clearly, this entire case with many counts leveled against an elected District Attorney involves to varying degrees the concept of obstruction of justice. This, however, is not what § 3C1.1 of the USSG contemplates. That Section suggests that courts only apply the obstruction of justice enhancement if it occurs in the instant case; it is not concerned with cases extraneous to the "investigation, prosecution, or sentencing of the instant offense." The PSI offered two reasons to impose the enhancement: (1) the Defendant schemed with others to find "dirt" to use against one of the witnesses; and (2) the Defendant committed perjury at

---

[1] While the jury actually found the existence of a criminal enterprise as defined by the RICO statutes, the Court in this opinion is referring to "enterprise" in a generic fashion.

2

trial.  With respect to the former, the Court finds that this enhancement may be appropriate in certain situations where a defendant uses illicit, threatening, coercive, or abusive techniques to dissuade a witness from testifying, but in the instant case, this kind of alleged scheme was never implemented.

With respect to the perjury allegation, the Court is equally dubious.  First, the Defendant has never been charged with or convicted of the actual crime of perjury.  The assessment was made on the basis that he testified on certain subjects and that he was impeached and ultimately not believed by the jury.  Again, while this Court can see certain circumstances where this enhancement might apply to testimony, in the instant case it was merely a situation in which the jury made its credibility decision against the Defendant.  The Commentary to this section explicitly states that a defendant should not be punished for exercising his constitutional rights, including the right to testify.  A denial of guilt is not a basis for the application of this provision. *See* Commentary 2 to § 3C1.1.  This Court is not convinced—and cannot confidently conclude— that Defendant's testimony rose to a level amounting to perjury.  Thus, the Court granted Defendant's objection to this enhancement.

## II.     Count 3: Hobbs Act ("Amit Livingston Murder Case)

The third count of the Superseding Indictment ("Indictment") charges the Defendant with violating the Hobbs Act, 18 U.S.C. § 1951,[2] by knowingly obstructing, delaying, and affecting commerce by extorting payments not due him or his office, and to which neither he nor his office was entitled, under color of official right.  It is alleged that "defendants Villalobos and Lucio did

---

[2] Count 3 additionally charges a violation of 18 U.S.C. § 2.  *See* Doc. No. 84, Superseding Indictment, Count 3.  All references to the Indictment are to the Superseding Indictment.

obtain approximately two-hundred thousand dollars ($200,000) in United States currency from a person, with that person's consent, under color of official right, in exchange for the performance and nonperformance of official acts of discretion by defendant Villalobos."[3]

The Court sets aside the jury's verdict in Count 3 based on its conclusion outlined below that the language of the Indictment prevents the satisfaction of the requirements under the Hobbs Act.

The jury was instructed that in order to find Defendant guilty of committing extortion under color of official right, it must have been convinced that the Government proved each of the following beyond a reasonable doubt: (1) that the Defendant wrongfully obtained property from another with that person's consent; (2) that the Defendant did so under color of official right; and (3) that the Defendant's conduct in any way or degree obstructed, delayed, or affected interstate or foreign commerce.  Following the law of this Circuit, the Court instructed that in order for the jury to find that Defendant "wrongfully obtained property under color of official right," it was sufficient that the Defendant understood that he was expected, in exchange for the payment, to exercise particular acts of official discretion on behalf of the payor.  In other words, the Government must have proved that the official accepted the money knowing it was designed to influence his or her actions.

The jury was presented with evidence that the Defendant arranged for the resolution of both the criminal and civil cases involving Amit Livingston in such a way that the $500,000 bond money posted by Dr. Livingston (Amit Livingston's father) was freed up immediately to

---

[3] Specifically, Villalobos was charged with receiving money from a "person" in exchange for Villalobos "fashioning the terms of a plea agreement to include sentencing at the time a guilty plea was entered by a criminal defendant, a civil settlement in the companion civil case in the amount of the cash bond that had been posted, and release pending self report by the defendant to prison, all to permit the cash bond to be used to satisfy the civil judgment and thereby enrich [himself] and Lucio." *See id.*

fund the settlement of the civil wrongful death case, with former Co-Defendant Lucio receiving $200,000 of the bond money, out of which he paid $80,000 to the Defendant. Based on this evidence, one might easily conclude that the payment from Lucio to the Defendant constitutes quintessential Hobbs Act extortion. The language of the Indictment, however, prevents Lucio from being the payor: if "Villalobos and Lucio did obtain" $200,000 "from a person, with that person's consent," Lucio cannot be the "person" to whom the Indictment refers. In other words, the Indictment alleged that a third person, other than Villalobos and Lucio, was the payor.

That being the case, the potential payors (or "person" as described in the Indictment) include (1) Dr. Livingston, who posted the $500,000 bond for the release of Amit Livingston pending trial and who eventually signed the agreement allowing that money to go toward settling the civil case; (2) the victim's family who obtained the $500,000 bond money in the civil settlement and turned over $200,000 of that to Lucio; (3) Cameron County, which retained the bond money until its release to satisfy the civil suit and which would have retained the bond amount upon Amit Livingston's failure to self-report had the money not gone to the victim's family; and (4) Judge Limas, whose signature was required for the release of the bond money to satisfy the civil suit. Without opining on who the appropriate payor or payors may have been, or whether the Government even needed to specify which "person" consented to the payment, the Court concludes that the evidence did not support a finding that any of the foregoing people or entities paid the Defendant "in exchange for" the exercise of "particular acts of official discretion on behalf of the payor." Each potential payor may have very well known that some of the money would be paid to Lucio. They may have even known of the very close relationship between Lucio and Villalobos; however, there was no evidence that any potential payor also

knew that Villalobos would receive a portion of that payment. The "consent" and "exchange for" elements of the Hobbs Act imply that the payor had to know that his or her payment was going to somehow benefit the official, who in turn would perform official acts of discretion on behalf of the payor. The Court finds that without sufficient evidence that a payor (other than Lucio) knew of the planned kickback to Villalobos when the payment was made or knew that Villalobos was receiving some other consideration for his actions, the jury's guilty verdict as to Count 3 cannot stand.

### III.    Count 5: Hobbs Act (Money Truck Case)

The fifth count of the Indictment charges Villalobos with extortion under color of official right for obtaining "two separate payments of five thousand dollars ($5,000.00), one from defendant Lucio and one from [Oscar De La Fuente], in exchange for the performance and nonperformance of official acts of discretion by defendant Villalobos, in a tractor-trailer money seizure case, including payments from the seized money of approximately forty-two thousand dollars ($42,000) each to defendant Lucio and [Oscar De La Fuente], as purported attorneys' fees and distributions to persons who had disclaimed any interest in the seized money." [Doc. No. 84, Superseding Indictment, Count 5].

The Defendant argued in his Motion for Judgment of Acquittal, [Doc. No. 219], that, because the allegation of the two payments was phrased in the conjunctive (one from Lucio **and** one from Oscar De La Fuente) in the Indictment and in the instructions to the jury, the jury must have found *both* Lucio and Oscar De La Fuente ("De La Fuente") paid Villalobos in order to find Villalobos guilty. According to the Defendant, there was no evidence regarding the Lucio

6

payment. The Government responded that the well-established rule is that a crime is properly charged in the conjunctive and proven in the disjunctive and, therefore, it was sufficient to support the verdict if only the De La Fuente payment was considered. According to the Government, there is no need to even get to the conjunctive/disjunctive argument because there was sufficient evidence of both payments.

The well-established practice in this Circuit that permits a disjunctive statute to be pleaded conjunctively and proved disjunctively is not applicable to the two payments alleged in Count 5. The purpose behind the disjunctive/conjunctive rule is to avoid uncertainty in charging an offense when the *statute* enumerates several different ways in which an offense may be committed. Charging in the conjunctive "neither renders the indictment bad for duplicity nor precludes a conviction if only one of the several allegations linked in the conjunctive in the indictment is proven." *United States v. McCann*, 465 F.2d 147, 162 (5th Cir. 1972). The rule has been applied in cases in which the statute punished, for example, "using *or* carrying a firearm," *see United States v. Pigrum*, 922 F.2d 249, 253 (5th Cir. 1991), or "purchasing, dispensing, *or* distributing a narcotic drug not in or from the original package," *see Turner v. United States*, 396 U.S. 398, 418-19 (1970). In those cases, the indictments tracked the language of the statute exactly except that they were charged in the conjunctive—"using *and* carrying," or "purchasing, dispensing, *and* distributing—and proof of any one of those acts was held sufficient to establish guilt. What renders this rule inapplicable in the present case is that the Indictment did not allege several *statutory* means of committing extortion; rather, the Indictment's allegation of two separate payments from two separate and distinct individuals, although listed in a conjunctive fashion, constituted the specific, factually-based *actus reus* of the offense. This

was simply not a case of the Indictment charging the language of the statute in the conjunctive. The jury therefore had to find both payments beyond a reasonable doubt in order to convict Defendant of Count 5, as instructed by the Court.

This Court recognizes that reasonable minds may differ as to its conclusion on the applicability of the conjunctive/disjunctive rule in Count 5. *See, e.g., United States v. Miller*, 471 U.S. 130, 132-36 (1985) (holding that, despite insufficient proof at trial of one of the two acts of fraud alleged in the indictment, even without the unproven allegation, the indictment still properly made out a violation of the statute: "the fact that [an] indictment alleges more crimes or other means of committing the same crime," will not violate the right to a grand jury "as long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment"). The manner in which Count 5 was charged, proven, and instructed may very well have been proper, and the Government is free to take that position. The Court notes that if it had considered the rule applicable, it could not have simply tracked the language of the statute by charging in the disjunctive, as other courts have done when faced with conjunctive pleadings but disjunctive proof, because the two payments alleged were not derived from the language of the statute itself. The Court therefore determined that the jury must have found both payments to convict Defendant of Count 5, following the language of the Indictment in instructing the jury.

Regardless of the Court's aforementioned conclusions, the Court found the evidence sufficient to support the jury's verdict. The Court first notes that the jury heard overwhelming evidence of the payment by De La Fuente, and as such, it will not go into a detailed analysis of

that evidence except to the extent that it applies to the determination of the sufficiency of the evidence regarding Lucio's payment. [4]

The jury was presented with the following evidence—which this Court will briefly paraphrase—in support of Lucio's payment:[5]

1) De La Fuente, a local attorney, and Villalobos were long-time friends and both grew up in San Benito, Texas. Lucio and Villalobos were also long-time friends and practiced law together as partners in Dallas at one time. Lucio's practice remained in Dallas and Villalobos returned to Cameron County to practice, where he was eventually elected as the District Attorney.

2) In the truck seizure case to which Count 5 refers, in 2008, Rafael Sanchez and Ricardo Chavez were pulled over while driving a truck that contained approximately $900,000 hidden therein. Mr. Sanchez was the driver and Mr. Chavez was the passenger. Both men signed waivers disclaiming all interest in the money. The State filed a petition seeking the seizure and forfeiture of the truck and the money alleged to be drug proceeds. De La Fuente found out about the seizure because a prior client of his, Julio Villarreal, the owner of the truck, was seeking the return of the truck. Mr. Villarreal was solely concerned about obtaining the return of the truck and

---

[4] The Defendant focuses his argument as to Count 5 on the lack of evidence of Lucio's payment and does not dispute that there was sufficient evidence of the *existence* of De La Fuente's payment. The only mention of the evidence being insufficient as to De La Fuente's payment is in regards to the amount De La Fuente paid Villalobos.

[5] The Court here is paraphrasing the evidence. Consequently, this recitation of facts should not be taken literally nor should it be considered as an exhaustive analysis of the record, which has yet to be prepared.

did not claim any interest in the money, nor did he want the money. Subsequently, De La Fuente met with Villalobos to discuss Mr. Villarreal's potential claim as to the truck. During this discussion, Villalobos suggested that De La Fuente represent the passenger, Mr. Chavez, because "there would be money to be had" if he did so. De La Fuente and Villalobos also discussed Lucio's representation of the driver, Mr. Sanchez, and the amount of money that would be paid to each of the individuals: Villalobos told De La Fuente that he had the deal worked out where De La Fuente would receive $50,000 if he represented Mr. Chavez and Lucio would likewise receive $50,000 for his representation of Mr. Sanchez. De La Fuente and Lucio would represent the two individuals despite the fact that both men had already fully disclaimed in sworn statements all interest in the money (and therefore waived any claims to the money) prior to Villalobos contacting De La Fuente and Lucio. De La Fuente testified that, in fact, all three individuals involved—Mr. Chavez, Mr. Sanchez, and Mr. Villarreal—denied having any knowledge about the money hidden in the truck. Therefore, had Villalobos not solicited De La Fuente and Lucio to file claims of ownership to the seized money on behalf of Mr. Chavez and Mr. Sanchez, the full $900,000 would have been retained by Cameron County. During the course of his meeting with Villalobos, De La Fuente reiterated Mr. Villarreal's claim to the truck, in which Villalobos responded that he would only offer $50,000 and that he

would "talk to the feds" to see what he could do.  Villalobos called De La Fuente back and explained that De La Fuente could have the truck, but the amount of money to be gained by each of De La Fuente and Lucio would have to be reduced to $42,000.  There was no evidence that Lucio or De La Fuente ever contacted Mr. Chavez or Mr. Sanchez about the forfeiture settlement or even that they were claiming interest to the money in each individual's name, purporting to represent them.

3)  Alfredo Padilla was in charge of the civil forfeiture section of the DA's office, and it was normal procedure for Padilla to handle civil forfeiture cases.  De La Fuente testified that, despite this, he did not discuss the forfeiture case with Padilla at all.  Instead, Villalobos took over the case and worked out a deal that awarded $42,000 of the seized money to Lucio and De La Fuente.  De La Fuente's testimony, as well as bank records of both De La Fuente and Lucio, proved the receipt of $42,000 by each.

4)  De La Fuente's testimony that he kept the full $42,000 and gave Villalobos a kickback because "it was understood that [Villalobos] was going to get some of the money back since [De La Fuente] had gotten $42,000 for little to no work."  De La Fuente subsequently made two different payments to Villalobos.

5)  Checks issued from Cameron County to Lucio and De La Fuente in the amount of $42,000, both dated August 20, 2008.

6)   Bank records of Lucio indicating that he deposited the $42,000 on August 25, 2008 at 3:14 p.m. Phone records showing a call or text between Lucio and Villalobos the same day at 3:23 p.m., 9 minutes later.

7)   Bank records showing Lucio withdrew $6,000 in cash on August 27th, at 3:18pm.

8)   Bank records of Villalobos showing that he obtained two money orders to pay a $285 mortgage payment and a $242 loan payment on August 30th. Bank records of Villalobos showing that he obtained a money order to pay a credit card bill in the amount of $15 on August 31st, despite having $792.36 in his checking account.

9)   Lucio's bank records revealed that Lucio withdrew $3,000 cash on September 16, 2008 at 9:56 a.m.  Phone records of Lucio and Villalobos from the same day showed text messages between the two men, the first of which occurred at 12:02 p.m., another one at 12:43 p.m., and a third one at 12:44 p.m.  The record showed a series of 5 more text messages between Lucio and Villalobos on the 16th, occurring from 7:31 p.m. to 7:43p.m.

10)  Villalobos's bank records 2 days after Lucio's $3,000 withdrawal, from September 18th-19th, indicating that he obtained 7 money orders totaling $2,567, yet had only withdrawn cash once in the month of September in the amount of $200 (on September 12th).  A cash deposit of $1,200 was also reflected in his records for September 18th-19th.  During this two-day

period, some of the money orders were purchased from HEB, while others
were purchased at Speedy Stop.

Considering the entirety of the circumstantial evidence surrounding Lucio, the similarity
in deals Villalobos had with both De La Fuente and Lucio, and the evidence regarding Lucio's
and Villalobos's other dealings, this Court finds that the circumstantial evidence was sufficient
for the jury to conclude beyond a reasonable doubt that Lucio made a payment to Villalobos in
exchange for Villalobos's official act of discretion in setting Lucio up with the forfeiture case.
Evidence of the first half of the extortion deal—that Lucio represented the forfeiture claimant at
the behest of Villalobos and obtained a check from the County for $42,000—was overwhelming
and virtually undisputed, and the jury could have easily inferred given the circumstantial
evidence that, like De La Fuente, Lucio kicked back some of the money he got for doing
essentially nothing to Villalobos.

The Court, viewing the evidence in the light most favorable to the Government, finds that
the evidence accepted by the jury was adequate and sufficient to support Defendant's conviction
under Count 5.

## CONCLUSION

This Court notes that, regardless of the correctness or incorrectness of either or both of its
rulings with regard to Counts 3 and 5, its sentence as to the Defendant would be exactly the same
as that pronounced in open court and which is included in the Judgment. This Court weighed
with great care, and with great discernment, the facts of the case, the counts of conviction and the
factors proscribed in 18 U.S.C. § 3553(a) when it sentenced the Defendant. The affirmation of

13

the guilty finding as to Count 3 or the setting aside of the jury's verdict in Count 5 (or any other count for that matter) would not affect the sentence imposed. The Court would still have instituted a sentence of 156 months.

Signed this 13th day of February, 2014.

Andrew S. Hanen
United States District Judge